IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

JOHN JOSEPH WURST )
and LAURA COLOMBO-WURST, )
)
Plaintiffs, ) TC-MD 120284D
)
v. )
)
DESCHUTES COUNTY ASSESSOR, )
)
Defendant. ) **DECISION**

Plaintiffs appeal the 2011-12 real market value of property identified as Accounts 152159

and 152178 (subject property). A trial was held in the Oregon Tax Court Mediation Center,

Salem, Oregon, on August 7, 2012. Plaintiffs appeared on their own behalf. Sean McKenney

(McKenney), Deschutes County Registered Appraiser, appeared on behalf of Defendant.

Plaintiffs' Exhibits 1, 4 and 5 and Defendant's Exhibits A through D were admitted

without objection. Defendant objected to Plaintiffs' Exhibits 2 and 3 because the individuals

who prepared the Residential Broker Price Opinion for Washington Federal (Plaintiffs' Exhibit

2) and Appraisal of Real Property for Washington Federal (Plaintiffs' Exhibit 3) did not testify.

Because those individuals who prepared Plaintiffs' Exhibits 2 and 3 did not testify and Plaintiffs'

Exhibit 3 was an appraisal report for a property located in La Pine but not the subject property,

Plaintiffs' Exhibits 2 and 3 were not admitted.

## I. STATEMENT OF FACTS

In his appraisal report, McKenney described the subject property:

"The subject property is located within the city limits of La Pine, Oregon
and less than a ¼ mile from Hwy 97.

"At issue is a 1.91 acre legal lot that is split by William Foss Rd dividing
it into two tax lots (acct #152159 and #152178). Account #152159 (lot #300) the
larger of the two tax lots has improvements on it. This lot is on the north side of

DECISION TC-MD 120284D 1

William Foss Rd. and is 1.23 acres. The second tax lot account #152178 (lot #600) is on the south side of the road and is .68 of an acre.

"The subject is improved with an 1539sq. ft. manufactured home, built in 2000. The home has an attached 480 SqFt garage. The subject was cleaned and had the carpets replaced before it was listed for sale. There was some minor deferred maintenance that included dry wall damage in the dining area. The condition of the home was average for the age of the home."

(Def's Ex A at 1.)

John Wurst (John)[1] testified that the subject property's real market value is $69,900. (Ptfs' Ex 1-1.) John testified that Plaintiffs "acquired title to these two assessor tax lots" March 26, 2011, paying "$69,900." (*Id.*) McKenney testified that the subject property was a "bank owned sale" that was "12 days pending on the residential multiple listing service" and the transaction "closed in 39 days." He testified that the "typical marketing time" is "three to six months" and concluded that Plaintiffs purchased the subject property at "below market value."

John testified that he and his wife are "actively engaged in purchasing properties in the La Pine market" and characterized the subject property as "a good investment," stating that they looked at "seven to eight or ten properties" in La Pine before purchasing the subject property. Laura Wurst (Laura) testified that even though the subject property is a "good investment property" within the city limits and "zoned commercial," she "wouldn't want to live" in the subject property" because it is "in town" and close to "old manufactured homes" and "trucks travel 20 to 30 miles per hour on the gravel road easement." Plaintiffs testified that the subject property has "negative issues," referencing "unrecorded and undocumented easements." In his appraisal report, McKenney acknowledged that Plaintiffs "pointed out the stored manufactured homes on the neighboring property" and stated that the "main road in the area, William Foss Rd

---

[1] When referring to a party in a written decision, it is customary for the court to use the last name. However, in this case, the court's Decision recites facts and references two individuals with the same last name, Wurst. To avoid confusion, the court will use the first name of the Wurst being referenced.

divides the two tax lots of the subject and Telegraph Rd. crosses tax lot 600." He concluded that he "was unable to find data that would give" him "any support to put a value on them" and "[n]o adjustment was given due to the lack of supporting data." (Def's Ex A at 11.)

McKenney testified that the subject property's "highest and best use" is its "current use as a single family residential home site with the potential to be changed to one of the uses allowed by the zoning." (Def's Ex B.) In response to questioning, McKenney testified that he did not value the "potential uses," only the subject property's current use as a residence.

McKenney's appraisal report stated that even though he considered the cost and income approaches to valuation he concluded that neither approach was applicable. (Def's Ex A at 13.) He testified that he relied on the "market approach" to determine the subject property's real market value. Both parties agree that the subject property is located in "the depressed market in the Central Oregon Region." (*Id*.)

Looking first at the land, McKenney testified that given the "depressed market * * * land only transactions are also rare." He testified that he reviewed "11 unbuildable lot" sales "sold in South Deschutes County" between "7/1/10 to 7/1/11 in the range of $7,000 to $14,000 in a size range of .49 of an acre to .64 of and (*sic*) acre." McKenney concluded that "[v]aluing tax lot 600 as excess land that can not have another residence placed on it would have similar value as the unbuildable lots in the south part of the county." (*Id*.) He testified that even though it was an unbuildable residential lot it "still could have commercial value" but he did not value as commercial property. McKenney determined a land real market value of $10,000 for Account 152178 (tax lot 600). (*Id*. at 16.)

McKenney briefly reviewed the characteristics of the subject property before concluding that "[d]ue to the inconsistent market in La Pine, it was not possible to pair the sales to determine

adjustments for the comparable sales." (*Id*. at 16.) McKenney made no adjustments for time, location, lot size or age to the three properties he determined were comparable to the subject property. (*Id*. at 15.) He testified that the age of the manufactured home located on each of the comparable properties was older than the subject property and if he made an adjustment it would be "a positive adjustment" based on "limited data." McKenney made an adjustment for gross living area to one of the comparable properties and adjustments for garage and outbuildings. (*Id.*) His adjusted sale prices ranged from $106,500 to $136,400. (*Id.*)

McKenney testified that he verified that the sale of each comparable property was an "arm's length transaction." (*Id.*) Two of the three properties were located more than four miles from the subject property and the third property was located nine miles from the subject property. (*Id.*) John challenged the comparability of the properties to the subject property, citing distance from the subject property and stating that one comparable was located in the "Ponderosa Pines subdivision" and another property "backed up to the national forest and had no neighbors." John testified that one property is located in Klamath County and is "less desirable" than Deschutes County. McKenney responded, stating that the Klamath County property selected "straddles" county lines but "directly competes with La Pine manufactured homes." McKenney conceded that he would "have liked to find sales next door" but the "market is difficult" and the subject property is "unique."

McKenney concluded that "[b]ased on the sales comparison approach, which indicates a value of $119,000, the current RMV of $103,000 is supported for tax lot 300 and recommended by the Defendant. Due to the volatile market, defendant does not request an increase in real market value for the 2011-12 tax year." (*Id.* at 16.)

II. ANALYSIS

The issue before the court is the subject property's real market value as of January 1, 2011. In Oregon, all real property "not exempt from ad valorem property taxation or subject to special assessment shall be valued at 100 percent of its real market value." ORS 308.232. ORS 308.205(1)[2] defines real market value as:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

A.    *Purchase Price*

When determining real market value, a "recent, voluntary, arm's length" sale of a property between a willing and knowledgeable buyer and seller, "while certainly not conclusive, is very persuasive of the [real] market value." *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973); see also *Sabin v. Dept. of Rev.*, 270 Or 422, 528 P2d 69 (1974); *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 414-15, 521 P2d 324 (1974).

Plaintiffs' March 26, 2011, purchase was close to the January 1, 2011, assessment date. Their purchase was fairly recent.

The next question is whether the sale was an "arm's length" transaction. At the time of Plaintiffs' purchase, the subject property was a bank-owned property. (Def's Ex D at 1.) This court has addressed the issue of bank-owned property previously, observing that:

> "A property purchased through foreclosure may well involve an element of compulsion on the part of the seller. There are many practical reasons why the sale of a property following foreclosure by the lender might involve an atypical market condition rendering the transaction of little or no value as an indication of market value. For example, the lender may have a policy of selling such property only for the amount of the underlying debt, regardless of what the property may

---

[2] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2011.

actually be worth, particularly if it would take a few months more to find a buyer willing to pay a higher price. If so, the sale, at best, likely represents the low end of the real market value range, and may have been well below the actual market value of the property."

*Kryl v. Lane County Assessor* (*Kryl*), TC-MD No 100192B, WL 1197444 *2 (March 30, 2011).

In *Kryl*, little weight was given to a bank-owned property sale when the bank sold the property a few months after acquiring it and with a short listing period. This court has also noted that, "a sale of bank-owned property conducted with such rapidity suggests duress or compulsion on the part of the seller, leading the court to conclude such sales as not indicative of an arm's-length transaction." *Brashnyk v. Lane County Assessor* (*Brashnyk*), TC-MD No 110308, WL 6182028 *5 (Dec 12, 2011).

The Department of Revenue has adopted an administrative rule which specifies that "[w]hen nontypical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.) the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the nontypical market condition." OAR 150-308.205-(A)(2)(c).

The Oregon Supreme Court, in *Ward v. Dept. of Revenue*, recognized that property purchased through foreclosure may be considered "a voluntary bona fide arm's-length transaction between a knowledgeable and willing buyer and a willing seller." *Ward v. Dept. of Revenue* 293 Or 506, 508, 650 P2d 923 (1982) (emphasis omitted). This court has also held that "[t]here are narrow exceptions determined on a case-by-case basis to the holding that bank-owned property sales are not typically representative of real market value." *Brashnyk*, TC-MD No 110308, WL 6182028 *5. "[W]here the majority of sales are distress, it would seem that that kind of sale would provide a more accurate reflection of the market." *Morrow Co. Grain Growers v. Dept. of Rev.*, 10 OTR 146, 148 (1985). Bank-owned property sales may be

considered as comparable sales for the purpose of establishing real market value, "when those bank-owned property sales have been exposed to the open market and meet the 'nominal standards for an acceptable comparable sale.'" *Brashnyk*, TC-MD No 110308, WL 6182028 *6.

McKenney testified that the subject property was exposed to the market for 12 days. John testified that the sale of the subject property was an arm's length transaction because he was a knowledgeable investor who looked at numerous properties before purchasing the subject property. The Appraisal Institute explains that the term "arm's-length" involves "[a] transaction between unrelated parties under no duress." Appraisal Institute, *The Appraisal of Real Estate* 305 (13th ed. 2008). This court has been reluctant to consider "foreclosure" sales as "arm's-length transactions" because such sales "may well involve an element of compulsion on the part of the seller." *Kryl*, TC-MD No 100192B, WL 1197444 *2 (Mar 30, 2011).

The subject property was a bank-owned property that Plaintiffs purchased within 15 days of its listing date. Without any other evidence to overcome the implication of duress or compulsion on the part of the seller in a market acknowledged by the parties to be "distressed," the court concludes that Plaintiffs' purchase of the subject property was not indicative of an arm's-length transaction. Given the limited exposure (15 days) to the market, Plaintiffs' purchase price of $69,900 is not singularly persuasive evidence in establishing the subject property's real market value.

B.    *Comparative sales approach*

Real market value is determined by the particular methods and procedures adopted by the Department of Revenue. ORS 308.205(2). There are three approaches to valuation (income, cost, and sales comparison) that must be considered when determining the real market value of a

/ / /

property. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995); see also OAR 150-308.205-(A)(2)(a). The valuation approach to be used is a question of fact to be determined on the record. *Pacific Power and Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979).

McKenney's appraisal report presented a comparable sales approach. (Def's Ex A.) McKenney concluded that the cost approach and income approach were not applicable. (*Id*. at 13.) Plaintiffs relied on their purchase price.

In a case such as this one before the court, the comparables sales approach may be used to value improved properties. *Chambers Management Corp v. Lane County Assessor*, TC-MD No 060354D, WL 1068455 at *3 (April 3, 2007) (citing Appraisal Institute, *The Appraisal of Real Estate* 335 (12th ed 2001)). Defendant adopted OAR 150-308.205-(A)(2)(c), stating that, "[i]n utilizing the sales comparison approach[,] only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

As the party seeking affirmative relief, Plaintiffs bear the burden of proving that the subject property's real market value is incorrect on the tax roll. ORS 305.427. Plaintiffs must establish their claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (July 12, 2001) (citing *Feves v. Dept. of Rev.*, 4 OTR 302 (1971)). Plaintiffs must present the greater weight of evidence to support his requested real market value reduction. Competent evidence includes, "appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and

licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D, WL 879285 (March 13, 2012). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990).

In the case before the court, Plaintiffs did not present a comparable sales approach. Plaintiffs offered a broker's opinion of value but the individual who prepared the report did not testify and none of the information contained in that report was substantiated. Plaintiffs offered an appraisal report prepared for the bank that owned the subject property at the time of sale but that appraisal report was not for the subject property and the appraiser did not testify. Plaintiffs criticized Defendant's comparable properties. This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted)). Plaintiffs' evidence in support of their requested real market value reduction is inconclusive. When the "evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed*, 310 Or at 265. Unfortunately, Plaintiffs failed to carry their burden of proof.

Even though Plaintiffs failed to carry their burden of proof and the "burden of going forward with the evidence" has not shifted, the court has jurisdiction to determine the "real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.427; ORS 305.412. McKenney, a registered appraiser, submitted an adjusted comparable sales analysis for the subject property. Even though Plaintiffs questioned the comparability of the properties selected by McKenney, the range of real market value for the properties supports the Deschutes County Board of Property Tax Appeals Order, dated March 13, 2012, and the real market values requested by Defendant.

### III. CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that Plaintiff failed to carry his burden of proof. The court accepts Defendant's determination of the subject property's real market value. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ＿＿ day of October 2012.

_____
JILL A. TANNER
PRESIDING MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on October 11, 2012. The Court filed and entered this document on October 11, 2012.*